IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

MOUZIN BROTHERS FARMS, LLC,          :
                                     :
            Plaintiff,               :
                                     :
VS.                                  :
                                     :          **7 : 20-CV-197 (TQL)**
RANDY DOWDY, and                     :
RANDY DOWDY FARMS, LLC,              :
                                     :
            Defendants.              :
_____  :

## ORDER

Pending is Plaintiff's Motion for Partial Summary Judgment. (Doc. 69). Both parties have

consented to the United States Magistrate Judge conducting any and all proceedings herein,

including but not limited to the ordering of the entry of judgment. The parties may appeal from

any such judgment, as permitted by law, directly to the Eleventh Circuit Court of Appeals. 28

U.S.C. § 636(c)(3).

## BACKGROUND

Plaintiff Mouzin Brothers Farms, LLC is an Indiana based company that grows fresh

produce. Dennis Mouzin is one of the owners of Mouzin Brothers Farms, LLC. Dennis

Mouzin and Defendant Randy Dowdy, a Georgia farmer, discussed the possibility of Randy

Dowdy growing sweet corn for Mouzin Brothers Farms, LLC, beginning in February or

March 2020. Despite multiple communications between the parties discussing potential

written contracts, the parties never executed a written contract.

Corn seed was delivered to Randy Dowdy, and was planted and grown by Randy

Dowdy in Brooks County, Georgia. A portion of the crop was harvested and transported by

Plaintiff. Defendant Randy Dowdy sold the remainder of the crop to a third party. Plaintiff

filed this diversity action in October 2020, raising claims of breach of contract, promissory

estoppel, unjust enrichment, and conversion. (Doc. 1). Randy Dowdy Farms, LLC was added

as a Defendant by Order dated March 30, 2021 (Doc. 21), and has asserted counterclaims.

(Doc. 22).

Plaintiff filed its Motion for Partial Summary Judgment on September 23, 2022, and

Defendants filed their response on October 14, 2022. (Docs. 69, 79, 80). Plaintiff filed a

reply on November 4, 2022. (Doc. 88).

ANALYSIS

***Summary Judgment standard***

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a).

> A party asserting that a fact cannot be or is genuinely
> disputed must support the assertion by:
> (A) citing to particular parts of materials in the record,
> including depositions, documents, electronically stored
> information, affidavits or declarations, stipulations (including
> those made for purposes of the motion only), admissions,
> interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the
> absence or presence of a genuine dispute, or that an adverse
> party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

As the party moving for summary judgment, Plaintiff has the initial burden to

2

demonstrate that no genuine issue of material fact remains in the case, as to the issues Plaintiff has identified. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record, including pleadings, discovery materials, and affidavits, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials - including the facts considered undisputed - show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Plaintiff has supported its motion with the deposition testimony of Dennis Mouzin, the deposition testimony of Randy Dowdy, and certain exhibits. (Docs. 69-3 – 69-5).

### *Choice of law*

In cases such as this brought in federal court and based on diversity of citizenship, the federal court is bound by the substantive law of the state where the district court is sitting. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64,78 (1938). The parties appear to agree that Georgia law governs the agreement at issue, as Plaintiff relies on Georgia law to interpret the agreement, and Defendants have not raised an objection to that portion of Plaintiff's argument.

There is nothing in the record to indicate that a choice of governing law was part of any agreement between the parties. In an "example" agreement provided by Dennis Mouzin to Randy Dowdy in March 2020, there is an election of Georgia law. (Doc. 69-3, p. 144). In

subsequent draft contracts provided by Dennis Mouzin to Randy Dowdy, Indiana law was to have been the governing law. (Doc. 69-3, pp. 213, 223, 232).

"In determining which law applies [in contract disputes], a federal district court sitting in diversity must apply the choice of law rules of the forum state." *Clanton v. Inter.Net Global, L.L.C.,* 435 F.3d 1319, 1323 (11th Cir. 2006). Georgia is the forum state, and Georgia courts look to the traditional rule of *lex loci contractus*, dictating that the law of the place where the contract was made governs contract interpretation, unless it appears from the contract itself that it is to be performed in another state. *See General Telephone Co. of Southeast v. Trimm,* 252 Ga. 95, 311 S.E.2d 460 (1984) (finding that traditional rule of *lex loci contractus* applies to Georgia contract, dictating that law of place where contract was made governs contract interpretation, unless it appears from contract itself that it is to be performed in another state; the last act essential to completion of the contract having occurred in Georgia, Georgia law applies); *see also GE Commercial Finance Business Property Corp. v. Heard,* 621 F. Supp. 2d 1305, 1307-1308 (M.D.Ga. 2009) (CDL), *internal citations omitted* ("Georgia, the forum state here, follows the traditional rule of *lex loci contractus*. Under this approach, [contracts] are to be governed as to their nature, validity and interpretation by the law of the place where they were made . . . Therefore, as to [] Georgia contracts, Georgia law shall apply in determining their validity".).

Although it is unclear at this time as to whether the last act essential to the completion of any contract occurred in Georgia or Indiana, the Court finds that the parties have waived any argument as to the possible application of Indiana law. *See Occidental Fire & Casualty Company North Carolina, Inc. v. Barnhart,* 2014 WL 12042531,*n.2 (N.D. Ga 2014)

4

(finding choice of law arguments waived as not argued or opposed by parties, and noting Court's lack of awareness of contrary conclusion under second state's law). *See also Liberty Mutual Fire Insurance Company v. State Farm Florida Insurance Company,* 2022 WL 1025164, \*3 (11th Cir. 2022) ("Because Liberty sued in the Southern District of Florida, we apply Florida's choice of law rules. And because neither party disputes that Florida substantive law governs under those choice of law rules, we apply Florida law".). Moreover, a review of Indiana law does not reveal any substantive distinctions when compared to Georgia law governing contracts.

## 1. ORAL AGREEMENT

Plaintiff first contends that there is no genuine issue as to the material fact that the parties entered into an enforceable oral agreement for the growing of sweetcorn. Defendants maintain that they do not dispute that an agreement was reached between Dennis Mouzin and Randy Dowdy in the Spring of 2020 for Defendants to grow sweet corn for Plaintiff, but they ultimately argue it is not an enforceable agreement.

Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-moving party, "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Crowley Maritime Corporation v. National Union Fire Insurance Company of Pittsburgh, PA,* 931 F.3d 1112, 1119 (11th Cir. 2019). However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380 (2007).

The undisputed facts show that following initial discussions between Dennis Mouzin and Randy Dowdy in March 2020, Plaintiff arranged for sweet corn seed to be delivered to

Defendants, and Defendants planted a portion of this seed. Although Defendants later attempted to pay for the seed, they were not provided with an invoice. Plaintiff arranged for the harvesting of the corn crop, and a portion of the crop was harvested and transported by Plaintiff. Although Dennis Mouzin and Randy Dowdy continued to have discussions as to price, none of the "example" contracts or proposed contracts provided by Dennis Mouzin to Randy Dowdy were ever signed by Randy Dowdy. As set out in Plaintiff's Statement of Undisputed Material Facts and admitted by Defendants in their response, "[b]oth parties contend the other agreed to their payment term, but they dispute what the payment term was." (Doc. 69-2, ¶ 15; Doc. 79-1, ¶ 15.). The remainder of the corn crop was not delivered to Plaintiff, but sold to a third party.

### Dennis Mouzin deposition

Dennis Mouzin was deposed on June 15, 2021. (Doc. 69-3). Mr. Mouzin talked to Mike Coggins about Defendant Randy Dowdy possibly growing corn in February or March 2020. *Id.* at p. 18. Mike Coggins recommended Randy Dowdy as a grower of sweet corn, and Dennis Mouzin had an example contract sent to Defendant Randy Dowdy. *Id.* at pp. 19-22. Mr. Mouzin quoted a price of $3.15 per crate for Dowdy to raise the corn, and then Plaintiff would "take over from there". *Id.* at p. 25. Mr. Mouzin believed that he had a "verbal deal" with Mr. Dowdy, whereby Mr. Dowdy would grow sweet corn for Plaintiff. *Id.* at p. 27. Mr. Mouzin had no recollection of a $2350 per acre price, and testified that the final price discussed was $3.15 per crate. *Id.* at pp. 40, 43. Mr. Mouzin testified that he ordered the seed and had it sent to Randy Dowdy. *Id.* at pp. 47-48, 53. Despite not having a signed written contract with Randy Dowdy, Mr. Mouzin believed they "had a deal" following their

discussions, an example contract being sent to Mr. Dowdy, and Mr. Dowdy planting the corn seed. *Id.* at pp. 58-60. When asked by Mr. Dowdy about participation in a market upswing, Mr. Mouzin told him that would be something to consider for the next year. *Id.* at p. 77.

### *Randy Dowdy deposition testimony*

Defendant Randy Dowdy was deposed on June 15, 2021. (Doc. 69-4). He testified that Mike Coggins put him in touch with Dennis Mouzin in March 2020. *Id.* at pp. 19, 21. Dowdy planted the seed he received through or from Plaintiff in March 2020 through April 2020. *Id.* at pp. 30-31. Dowdy asked various farmers and farming experts about expected costs in growing sweet corn. *Id.* at pp. 28-34, 35-36.

At some point in their discussions Dowdy told Dennis Mouzin:

> A. "Dennis, I don't think I can grow it under the terms that you have proposed."
>
> Q. And what terms were those?
>
> A. That was outlined in the example that he submitted on March the 10th in the Generation Farms contract.
>
> Q. And that was 3.15 a crate?
>
> A. With all the other particulars that embodied that contract.

*Id.* at p. 37.

> Q. And what did Dennis say?
>
> A. "Randy, tell me what you've got to have." And I did.
>
> Q. What did you say?
>
> A. I told him that I – at a minimum, I was going to go with the

higher of the two budgets at eighteen fifty and I wanted to make $500 an acre on it, and that's where the twenty-three hundred and fifty dollar number came from.

And it was going to be per acre – I was going to get paid twenty-three hundred and fifty dollars per acre. But then I asked the question, "Hey, what if this market goes up? I would like to be able to participate in the upside."

Q. You asked this in March?

A. Oh, yes, sir. I asked it number times.

Q. And what did Dennis say?

A. "Randy, I'm going to send you this contract. We'll get what we talked about memorialized in writing." I said . . . "I'd rather this be in writing and not a he said/she said deal. . . But I want this in writing. I want our conversations memorialized in writing and let's agree to the terms of what's expected of me . . . ".

Q. You told him this in March?

A. Absolutely.

Q. Is it your testimony here today under oath that Dennis agreed to pay you eighteen fifty an acre plus five hundred an acre, for a total of twenty-three fifty, with, I guess, unresolved about how you share an upside?

A. It was understood that the budgets may be significantly higher. He knew my wishes of wanting to have twenty-three hundred and fifty dollars an acre to grow his crop.

Q. In March?

A. Correct.

. . .

Q. You believe you made that clear to him in March, before any corn was planted?

8

> A. Crystal.

*Id.* at pp. 38-40.

Dowdy continued, stating that:

> I didn't – I didn't care [about what type of seed was planted]. I was going to get paid by the box.
>
> . . .
>
> If we went with his deal. And then, if it didn't go with his deal, I was going to [be] paid twenty-three hundred and fifty dollars an acre.

*Id.* at p. 42.

According to Dowdy's deposition testimony, he made it clear to Dennis Mouzin that he would not take the $3.15 per crate offer, and that he wanted to receive $2350 per acre, plus participation in any upswing in the market price for corn. *Id.* at pp. 42-43. As to his participation in a market upswing, Dowdy testified that "[t]hat was never clearly defined, but it was discussed from Day 1." *Id.* at p. 43.

> Q. And your testimony is Dennis Mouzin said, "Yeah, I'm okay with all that"?
>
> A. The only thing he said was, "Randy, I think" – "Since we don't know what your costs are," he says, "I will make it up to you." I don't want you to take and be in a position that you're upside down, but" –
>
> I said, "Well, I can tell you twenty-three fifty is my floor." And he said, "Well, we'll discuss that once we know what your true costs are at the end of the year." And I said, "That's not going to work. I want to know what my floor is and I want it memorialized in a contract."
>
> Q. To which he said?

9

A. "Okay."

Q. He said he would put that in the contract?

A. Yes.

Q. Your twenty-three fifty?

A. Twenty-three fifty was the number that we had discussed
from Day 1.

*Id.* at p. 44.

### *Dowdy declaration*

In support of his Motion for Summary Judgment, Randy Dowdy executed a

declaration on September 29, 2022, and he relies in part on this declaration in opposing

Plaintiff's Motion for Partial Summary Judgment. (Doc. 75-2). Dowdy states that he makes

the declaration "under penalty of perjury pursuant to the laws of the State of Georgia", and

that he makes the declaration "of my personal knowledge in support of my and my

company's motion for Summary Judgment". *Id.* The document is not notarized, and does not

state that the testimony is true and correct. *Id.* As such, the document does not satisfy the

statutory requirements for an unsworn declaration under 28 U.S.C. § 1746, and will not be

considered by the Court.

> At the summary judgment stage, parties may submit traditional
> affidavits sworn under oath before a notary (or other oath-taker)
> affixed with the notary seal. . . Unsworn statements may not be
> considered by a district court in evaluating a motion for
> summary judgment. An unsworn statement is incompetent to
> raise a fact issue precluding summary judgment.
>
> A statutory exception to this rule exists under 28 U.S.C. § 1746,
> . . . [which] has these statutory requirements for an unsworn

statement to substitute for a sworn affidavit: The declarant must
(1) date and sign the document, and (2) subscribe its content as
"true," (3) under "penalty of perjury", (4) in substantially the
above-quoted pattern language.

*Roy v. Ivy,* 53 F.4th 1338, 1347-48 (11th Cir. 2022).

Further, Defendant Dowdy's subsequently filed declaration, wherein he states that his

earlier "declaration's statement was also true and correct", does not correct the issue, as the

subsequent document also is not notarized, and does not state that the testimony is true and

correct as required by 28 U.S.C. § 1746. (Doc. 94-1). Additionally, the subsequent

declaration does not identify which "statement" in  the earlier declaration "was also true and

correct". *Id.*

### Beth Cooper deposition

Beth Cooper, an employee of Plaintiff, was deposed on July 27, 2022, and Defendants

rely in part on this deposition testimony in opposing Plaintiff's Motion for Partial Summary

Judgment. (Doc. 80-1). Ms. Cooper testified that she coordinates trucks and orders to be

filled for Plaintiff, including filling in and producing contract drafts as directed by a team of

others employed by Plaintiff. *Id.* at pp. 8-11, 14-15. Although Ms. Cooper prepared the

documents that were sent to Randy Dowdy, she had little or no knowledge of the terms

discussed between Dennis Mouzin and Randy Dowdy, and did not know or could not

remember who supplied her with information for the draft contracts or why said information

was given. *Id.*  at pp. 25-27, 35-36, 39-43, 45, 48, 51, 54-55, 59, 63, 67-68, 70, 78. Ms.

Cooper did confirm that Plaintiff never received signed contracts from Randy Dowdy. *Id.* at

p. 79.

***Georgia law***

Under Georgia law, "[a] contract is an agreement between two or more parties for the doing or not doing of some specified thing", and "[t]o constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. §§ 13-1-1, 13-3-1. As argued by Plaintiff, there is no requirement that an agreement such as the one alleged to have been reached between Dennis Mouzin and Randy Dowdy be reduced to writing. *Cline v. Lee,* 260 Ga. Ct. App. 164, 168, 581 S.E.2d 558 (2003) ("A contract may be enforceable even though it rests only in words as remembered by the witnesses"; agreement not governed by the Statute of Frauds).

However, to be enforceable, a contract must be set forth with "such certainty and completeness that either party may have a right of action upon it". *Jackson v. Williams,* 209 Ga. Ct. App. 640, 642, 434 S.E.2d 98 (1993). "[I]f there was in fact any essential part of the contract upon which the minds of the parties had not met, or upon which there was not an agreement . . . it must follow that a valid and binding contract was not made . . . Further, as price is an essential element of a valid contract, an alleged contract on which there is no firm agreement as to the price is unenforceable." *BellSouth Advert. & Pub. Corp. v. McCollum,* 209 Ga. Ct. App. 441, 444-45, 433 S.E.2d 437 (1993). *See Alcatraz Media, Inc. v. Medieval Times Georgia, Inc.,* 2011 WL 13213913 (N.D.Ga. 2011) (finding agreement without a price term, or reference to rate schedule, failed, as price is an essential term for a valid contract).

Although Randy Dowdy's deposition testimony is clear that he conveyed his counteroffer of $2350 per acre and participation in market upswings, it is unclear whether

12

Dennis Mouzin ever agreed to these terms, or simply agreed to subsequently clarify or propose new terms in a written contract. According to Dowdy, none of the subsequent contract drafts sent by Dennis Mouzin included the $2350 per acre price or terms as to participation in market upswing. (Doc. 69-4, p. 89). Dowdy's later testimony indicated that the parties had not reached an agreement as to the terms of the contract, as he stated he stopped harvesting and delivery of the corn to Plaintiff because there was no "deal". *Id.* at pp. 81, 84, 88, 89. Genuine issues of material fact remain as to whether the parties ever reached an agreement as to price and Randy Dowdy's participation in market upswing. The documents,  emails, and texts exchanged between Dennis Mouzin and Randy Dowdy do not establish that the parties reached an agreement as to price or market upswing participation. (Doc. 69-3, pp. 136-243; Doc. 69-4, pp. 192-349; Docs. 79-2 – 79-5).

The indefiniteness as to price was not obviated by any subsequent performance of the parties, as "[t]hat performance which would remove the original indefiniteness must itself relate to the contested term of the contract." *Arby's, Inc. v. Cooper*, 265 Ga. 240, 242, 454 S.E.2d 488 (1995). *Cf. Pine Valley Apartments Limited Partnership, et al. v. First State Bank,* 143  Ga. Ct. App. 242, 237 S.E.2d 716 (1977) ("a contract which is originally too indefinite may later acquire precision and become enforceable by virtue of the subsequent acts, words, or conduct of the parties", noting parties did not disagree as to price). The undisputed material facts show that seed was delivered to Randy Dowdy, who planted the seed and grew the corn, and that a portion of the crop was harvested by crews working for Plaintiff and transported on behalf of Plaintiff. None of these aspects of subsequent performance pertained to the setting of a price in the contract. *Cf. Reebaa Const. Company,*

*Inc. v. Chang Sop Chong,* 283 Ga. 222, 657 S.E.2d 826 (2008) (evidence supported jury's finding that contract was sufficiently definite to be enforceable, based on evidence that homeowner assented to increased costs, as he was aware of cost of upgrades and repeatedly insisted that money was no object).

At this stage of the proceedings, viewing the facts in the light most favorable to the non-moving party, the parties appear to have reached an agreement to agree, which is not enforceable under Georgia law. *Stephens v. Trust for Public Land,* 475 F. Supp. 2d 1299, 1310 (N.D.Ga. 2007). "If a contract fails to establish an essential term, and leaves the settling of that term to be agreed upon later by the parties to the contract, the contract is deemed an unenforceable 'agreement to agree'". *Kreimer v. Kreimer,* 274 Ga. 359, 552 S.E.2d 826, 829 (2001).

## 2. GEORGIA DEALER'S LICENSE

Plaintiff next contends that it is entitled to summary judgment on the issue of a Georgia agricultural dealer's license. In answering Plaintiff's Complaint, Defendants raise the affirmative defense that the State of Georgia requires a company that purchases produce from Georgia growers to obtain a produce dealer's license, and Plaintiff's license had expired as of December 31, 2019. (Doc. 11, ¶¶ 49-50). Defendants contend that as a result of the Plaintiff being unlicensed as a dealer of produce in Georgia, the "actual agreement with Defendant by Plaintiff was illegal, prohibited, and unenforceable". *Id.* at ¶ 53.

Pursuant to the Dealers in Agricultural Products Act (the Act), codified at § 2-9-2 of the Official Code of Georgia Annotated, "[i]t shall be unlawful for any dealer in agricultural products who comes within the terms of this article to engage in such business in this state

14

without a state license issued by the Commissioner." A "dealer in agricultural products",

which includes fruits and vegetables, "means any person . . . partnership, or corporation

engaged in the business of buying, receiving, selling, . . .or soliciting the sale, resale,

exchange . . . **of any agricultural products purchased from the producer**". O.C.G.A. § 2-

9-1 (2), *emphasis added*. Pursuant to § 2-9-15 of the Georgia Code, this licensing

requirement does not apply to "farmers or groups of farmers in the sale of agricultural

products grown by themselves". O.C.G.A. § 2-9-15.

  In its Motion for Partial Summary Judgment, Plaintiff alleges that it was not a dealer

under the Georgia statute and was not required to have a Georgia agricultural dealer's

license, as it was not purchasing produce from Defendants. Plaintiff contends that the

licensing requirement does not apply to the contract at issue, as the contract between the

parties was for growing services. Plaintiff further argues that it owned the seed provided to

Defendants and was selling its own produce.

  In response to Plaintiff's Motion for Partial Summary Judgment, Defendants argue

that Plaintiff was the purchaser of the corn being grown by Defendants. Defendants further

argue that Plaintiff was presented with invoices for the purchase of the corn on June 11,

2020.

***Deposition testimony***

  In his deposition, Defendant Dowdy testified that:

    A.  I was going to have to pay for the seed cost.

    Q. You were paying for seed?

    A. Absolutely.

15

Q. That was another issue or topic that was discussed in these
   numerous phone calls – several phone calls?

A. It was in the contract that I looked at, that I would be
   responsible for the seed cost, and he told me that I would be
   responsible for the seed cost.

   And I asked him about how that would be paid out and he
   says, you know, "We'll just take it out of proceeds at the end
   of the year and we'll settle up then."

Q. Okay. And you said?

A. "Okay." . . .

. . .

Q. As we sit here today, who has paid for the sweet corn seed?

A. Dennis Mouzin.

Q. Have you ever paid him back for it?

A. He wouldn't submit me a bill to pay it back. . .

(Doc. 69-4, pp. 45-47).

Dennis Mouzin testified in his deposition that "[w]e would provide the seed to show
that there was an obligation from us that we will show up at harvest", and he personally
ordered the seed for Defendant Dowdy to plant. (Doc. 69-3, pp. 30, 47-48). Mr. Mouzin
stated that he remembered Mr. Dowdy asking him for the seed invoice, but that he did not
send it to him because everything had already fallen apart. *Id.* at p. 101.

In *San Miguel Produce, Inc. v. L.G. Henderson Jr. Farms, Inc.,* 308 Ga. 812, 843
S.E.2d 403 (2020), the Supreme Court of Georgia answered a set of certified questions from
the United States District Court for the Southern District of Georgia. The Supreme Court of

16

Georgia found that

> an entity [that purchases produce from other growers, has it
> processed, and then markets, sells, and ships that produce] does
> qualify as a dealer in agricultural products under the [Georgia
> Dealers in Agricultural Products] Act and is not exempt under
> OCGA § 2-9-15 (a)(1), with the limited exception of specific
> transactions "in the sale of agricultural products grown by
> [itself]." . . . [I]f a dealer has failed to obtain a license as
> required by OCGA § 2-9-2, it may not recover under a contract
> to the extent that the contract relates to business coming within
> the terms of the Act.

*San Miguel Produce,* 308 Ga. at 813-14.

The plaintiff San Miguel entered in to a "Grower-Shipper Agreement" with the

defendant Herndon Farms, whereby Herndon Farms grew and delivered produce ordered by

San Miguel. *San Miguel,* 308 Ga. at 814. San Miguel did not dispute that it was a "dealer"

under the Act, but instead asserted that it was exempt from the Act because it was part of a

"group of farmers" under O.C.G.A. § 2-9-15 (a)(1).  *Id.* at 816.

In *Florists Mutual Insurance Company v. Lewis Taylor Farms, Inc., et al.*, 2008 WL

875493 (M.D.Ga. 2008) (HL), this Court determined that the warranty provisions of the

Uniform Commercial Code did not apply to a contract whose predominant element was the

provision of services as opposed to goods. The Court determined that

> [i]f [Company A] had purchased all of the seed that was to be
> grown to seedling stage and provided it to [Company B], it
> would be evidence that the contract was one for services, as in
> *Gilbert* [*v. Copeland*, 97 S.E. 251 (1918)]. In such a case, the
> overriding purpose of the contract would be to provide a
> 'shortcut' to [Company A]; instead of [Company A] having to
> expend the time, resources, and space required to grow its seeds
> to seedling stage, [Company B] would provide this service for
> it. Alternatively, if [Company B] took orders for bell pepper
> seedlings and ordered all its own seeds independently, it would

17

> be plain that the contracts it entered into would be for the sale of
> goods and seeds would simply be materials that it had to buy to
> produce those goods.

*Id.* at *10.

As "[t]here is no written contract . . . the Court must rely on the Parties' descriptions

of the contract and the context in which the contract was made." *Id.* at *9. Viewing the facts

in the light most favorable to Defendants, although Plaintiff provided the seed, Defendants

were to ultimately pay for the cost of the seed.

Defendants assert in their response to Plaintiff's Motion for Partial Summary

Judgment that the example and proposed contracts sent by Dennis Mouzin were drafted as

purchasing agreements rather than as growing services agreements. These example and

proposed contracts provide some context for and support for interpreting the parties'

intentions. However, none of these contracts were actually signed or agreed to by Defendant

Dowdy. Although Dennis Mouzin signed the proposed contracts, there is no evidence that

both parties assented to the essential terms. *See Royal Mfg. Co., Inc. v. Denard & Moore*

*Const. Co., Inc.,* 137 Ga. Ct. App. 650, 224 S.E.2d 770 (1976). "The consent of the parties

being essential to a contract, until each has assented to all the terms the contract is

incomplete . . . while a simple informal contract, though enforceable, is considered

superseded by a formal written contract signed by both parties . . . it does not follow that an

oral contract, if it in fact has been arrived at, is merged into a proposed written agreement

signed by only one party and rejected by the other. Until signed by both parties, the paper is

ineffective for any purpose". *Id.* at 650, *internal citations omitted.*

Genuine issues of material fact remain as to whether any agreement between Plaintiff

18

and Defendants was reached and enforceable, whether such agreement was for growing services, and as to whether Defendants were selling the corn to Plaintiff, or were selling their growing services.

In regard to Plaintiff's argument that it was engaged in the sale of its own agricultural products, the undisputed facts show that neither the seed nor the sweet corn was "grown by [Plaintiff]", as required by the exception to the licensing requirement of the Act in § 2-9-15. (removing "farmers or groups of farmers in the sale of agricultural products grown by themselves" from licensing requirement for dealers). This exception does not apply to Plaintiff under the undisputed facts herein.

## 3. PACA COUNTERCLAIMS

Plaintiff also argues that it is entitled to summary judgment on Defendants' PACA, or Perishable Agricultural Commodities Act, counterclaims. In its Answer, filed by Defendant Randy Dowdy Farms LLC at the Court's direction, Defendant Randy Dowdy Farms LLC alleged in its first and second counterclaims that Plaintiff failed to pay Defendants' invoices for the seventeen (17) shipments of corn that were harvested and transported by Plaintiff, and thereby violated the PACA. (Doc. 22, ¶¶ 64-79). Plaintiff maintains that Randy Dowdy Farms LLC does not have a PACA license, and did not sell the corn at issue, making the Defendants' counterclaims unsupportable.

Defendants maintain that they were not required to hold a license under PACA, as they were not "dealers" under the Act, and that any sale of produce involved produce Defendants had raised.

The Perishable Agricultural Commodities Act, or "PACA", codified at 7 U.S.C. §

499a, *et seq*, was enacted in 1930 to encourage fair trade practices in the marketing of perishable commodities, and requires that dealers of perishable agricultural commodities placed in interstate or international commerce be licensed by the Secretary of Agriculture. PACA requires produce dealers to make "full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had". 7 U.S.C. § 499b(4). "Full payment promptly" is defined in the Code of Federal Regulations as payment within ten (10) days after the date of acceptance of the regulated produce, unless the parties execute a specific written agreement to the contrary at the time of the sale. 7 C.F.R. § 46.2(aa). The Act was amended in 1984 to "establish a nonsegregated statutory trust under which a produce dealer holds its produce-related assets as a fiduciary until full payment is made to the produce seller." *Frio Ice, S.A. v. Sunfruit, Inc.,* 918 F.2d 154, 156 (11th Cir. 1990). "The PACA grants the sellers of [perishable agricultural] commodities the right to recover against the purchasers and puts the sellers in a position superior to all other creditors." *Gargiulo v. G.M. Sales, Inc.,* 131 F.3d 995, 999 (11th Cir. 1997).

Under PACA, a "dealer"

> means any person engaged in the business of buying or selling in wholesale or jobbing quantities . . . any perishable agricultural commodity in interstate or foreign commerce, except that (A) no producer shall be considered as a "dealer" in respect to sales of any such commodity of his own raising[.]

7 U.S.C. § 499a(b)(6).

Under PACA, "no person shall at any time carry on the business of a commission merchant, dealer, or broker without a license valid and effective at such time." 7 U.S.C. § 499c(a). It is

undisputed that Defendants do not hold a PACA license.

Defendants, however, are not required to be licensed "dealers" under the PACA to bring a claim under the Act, as § 499e (c)(3) provides that an "unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days . . . after the expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary". 7 U.S.C. § 499e (c)(3). One of the cases on which Plaintiff relies, *Alvaro v. Rey Rey Produce SFO Inc.,* 2008 WL 410274 (N.D.Cal. 2008), explains that "[t]here are two avenues for becoming and remaining a trust beneficiary . . . First, [under § 499e (c)(3)] an "unpaid supplier, seller, or agent" may establish benefits by giving "written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker". Defendants provided written notice on June 15, 2020. (Doc. 75-19). Section 499e (c)(4) provides that "[i]n addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust." 7 U.S.C. § 499e (c)(4).

Additionally, if, in fact, Defendants' transfer of the corn to Plaintiff was a sale of the corn, and not simply a sale of growing services, Defendants would not be "dealers" under the PACA, as Defendants raised the corn. *See* 7 U.S.C. § 499a(b)(6) ("no producer shall be considered as a "dealer" in respect to sales of any such commodity of his own raising"). As previously found herein, genuine issues of material fact remain as to whether Defendants were selling the corn to Plaintiff or were selling their growing services only to Plaintiff.

21

*Conclusion*

Genuine issues of material fact remain as to whether the parties entered into an enforceable agreement, as to the terms of such agreement, and as to whether the agreement was for the sale of goods or for growing services.  Plaintiff's Motion for Partial Summary Judgment is accordingly **DENIED**.

**SO ORDERED**, this 30th day of December, 2022.


s/ ***Thomas Q. Langstaff***

UNITED STATES MAGISTRATE JUDGE